AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Cellphone<br>FP&F No. 2023565600003201 Item 0001<br>("Target Device 1") | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.   **23mj1655** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § § 1324(a)(1)(A)(i),<br>(A)(ii), (v)(I) & (v)(II) | Bringing in Illegal Aliens Without Presentation, Transportation of Illegal Aliens,<br>and Conspiracy and Aiding and Abetting the Same |

The application is based on these facts:

See attached Affidavit of Border Patrol Agent Alexander C. Susral, Jr.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alexander C. Susral, Jr., Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:   _____05/11/2023 1:13 p.m._____

_____
*Judge's signature*

City and state:   San Diego, California

Bernard G. Skomal, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Cellphone
FP&F No. 2023565600003201 Item 0001
**("Target Device 1")**

**Target Device 1** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector located at 311 Athey Avenue, San Ysidro, California 92173.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **Sept. 8, 2022, up to and including April 10, 2023**:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States and facilitate the transportation of smuggled aliens within the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and the transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

all of which are evidence of violations of Title 8, United States Code, Section 1324 (bringing in and transporting undocumented aliens and conspiracy to do same).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## AFFIDAVIT

I, Alexander C. Susral, Jr., being duly sworn, hereby state as follows:

### INTRODUCTION

1.      I submit this affidavit in support of applications for warrants to search the following electronic devices:

> Black Cellphone
> FP&F No. 2023565600003201 Item 0001
> (**"Target Device 1"**)
>
> Blue T-Mobile Phone
> FP&F No. 2023565600003301 Item 0001
> (**"Target Device 2"**)

(collectively, the "**Target Devices**"), as further described in Attachments A-1 and A-2, and to seize evidence of  crimes, specifically, violations of 8 U.S.C. § 1324 (a)(I)(A)(i), Bringing in Illegal Aliens Without Presentation, 8 U.S.C. § 1324(a)(I)(A)(ii), Transportation of Illegal Aliens, 8 U.S.C. § 1324(a)(I)(A)(v), and Conspiracy/Aiding or Abetting the same, as further described in Attachment B.

2.      The requested warrants are related to the prosecution of Raul CRUZ and Jorge Luis RIVERA-Santiago. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector located at 311 Athey Avenue, San Ysidro, California 92173.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

1

**TRAINING AND EXPERIENCE**

4.     I have been employed by the USBP since 2011 and am currently assigned to the Boulevard Station Abatement Team. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.     My current duties involve the preparation of criminal and administrative cases for prosecution against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and the utilization of illegally obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.     During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California.  I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities.  Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit,

providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.      The smuggling of aliens may generate many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens.  For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States.  These communications may also include locations for delivery to stash houses and/or sponsors.  Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing.  It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and

consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a.     tending to indicate efforts to smuggle aliens from Mexico into the United States and facilitate the transportation of smuggled aliens within the United States;

b.     tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and the transportation of smuggled aliens;

c.     tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and the transportation of smuggled aliens;

d.     tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.     tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.     **Target Device 1** was seized during CRUZ's arrest on April 9, 2023, and **Target Device 2** was seized during RIVERA's arrest on April 10, 2023. The **Target Devices** were transported to the Border Patrol office above and have been maintained in

evidence since. As set forth below, evidence indicates CRUZ and RIVERA coordinated the transportation of illegal aliens from the Southern District of California to the Los Angeles area and harbored illegal aliens.

12.     In January 2022, Border Patrol Agents began investigating an alien smuggling organization that was recruiting drivers via Facebook advertisements to transport undocumented individuals from the San Diego area to the Los Angeles area. Agents identified an apartment and associated garage at 1448 S. Woods Avenue, Apartment C, Los Angeles, CA 90022 as a drop-off point and stash house for the organization. Agents learned that CRUZ and RIVERA were associated with that address. CRUZ's driver's license and a small claims judgment listed his address as 1448 S. Woods Ave., Apt. C, Los Angeles, CA 90022 (H-1), and (323) 608-3987 (T-3) was a phone number that agents connected to CRUZ.

13.     From approximately February 24, 2022, to September 13, 2022, agents arrested more than ten individuals for transporting undocumented individuals. Evidence in each case—often post-arrest statements—indicated the undocumented individuals were being transported to H-1 or a Winchell's Donut House near H-1. In several instances, evidence also indicated CRUZ and/or RIVERA were receiving the undocumented individuals and paying the drivers.

14.     For example, on June 3, 2022, L-1 was arrested near Indio, California with two undocumented individuals in his car. Post-arrest, L-1 stated he/she was working for a "Luis" and Luis' brother "Cholo Pollo." L-1 identified CRUZ from a photo lineup as Cholo Pollo. L-1 said T-3 was CRUZ's phone number. L-1 stated he/she successfully smuggled people for Luis and CRUZ multiple times. Each time, he/she picked up the undocumented people in eastern San Diego County and drove them to an alleyway behind H-1. CRUZ told L-1 to share his/her live location via WhatsApp while L-1 was transporting the individuals. When L-1 arrived at the alleyway, CRUZ would come out of the open garage, pay him/her, and escort the individuals out of his car and into the garage.

15.     On September 13, 2022, L-2 was arrested near a casino in Alpine, California with two undocumented individuals in his car. Post-arrest, L-2 stated he/she answered a Facebook advertisement looking for people to drive individuals from the San Diego area to the Los Angeles area for $2000-4000. L-2 stated he/she successfully smuggled two people on September 7, 2022. During that trip, L-2 was asked to share his/her live location with T-3 via WhatsApp. L-2 picked up the two individuals in eastern San Diego County and drove to Winchell's, 1455 South Atlantic Boulevard, Los Angeles, California, which is close to H-1. Once there, T-3 directed L-2 to drive to an alleyway behind an apartment complex close to the Winchell's. When L-2 arrived in the alleyway, a man came out of a garage to receive the people and to pay L-2. L-2 recognized the man as "Raul," because L-2 used to live in the area. L-2 identified CRUZ from a photo lineup as Raul. CRUZ paid L-2 $2000 in cash and asked the individuals to get out of the car.

16.     On July 5, 2022, agents arrested RIVERA for attempting to transport six undocumented individuals in a Ford Explorer.  Record checks on the vehicle indicated that it was registered to RIVERA at H-1. During a post-arrest interview, RIVERA admitted picking up the undocumented individuals in Jacumba, California.  RIVERA stated that he was on his way to Los Angeles when he was pulled over, and that he was guided by "Adrian" on WhatsApp. Three days earlier, on July 2, DHS systems had recorded the same Explorer traveling west on Interstate 8 near Pine Valley, California at 6:35 am (I-8 runs east-west a few miles north of the U.S.-Mexico border), then northbound on Interstate 5 near Oceanside, California at 8:03 am. At 9:24 am, a pole camera recorded the Explorer in the alley behind H-1. Several people were waiting when it arrived, and multiple people got out of the car. I believe the Explorer transported undocumented individuals to H-1.

17.     On August 31, 2022, via the pole camera, agents saw CRUZ, RIVERA, and a third person get into a car. A tracking device on the car indicated it traveled to a residence in Kirkland, Washington, arriving on Sept. 1, 2022. The car was stationary at the residence for under 10 minutes before heading back towards California. The car arrived at H-1 on Sept. 2. CRUZ and RIVERA got out of the car; the third person did not. I believe CRUZ

6

and RIVERA transported an undocumented individual to the Kirkland residence. Alien smugglers in the U.S. often will transport undocumented individuals further within the U.S. for an additional fee.

18.     On September 8, 2022, an undercover agent (UC-1) spoke to two individuals using Mexican phone numbers who directed UC-1 to a location on I-8 east of Jacumba to pick up undocumented aliens. UC-1 picked up two undocumented aliens at that location. UC-1 then received instructions to drive towards a casino in Alpine, California. Once at the casino, UC-1 received directions to drive to a mall in Commerce, California. En route, a person called UC-1 and spoke with the undocumented individuals. Smugglers often do this to verify who has been picked up so they may contact sponsors to arrange pick up and payment. Afterwards, UC-1 received a WhatsApp message from T-3 directing UC-1 to 1455 S. Atlantic Blvd., Los Angeles, the address for the Winchell's.

19.     UC-1 thereafter stopped the car, agents arrested the two aliens, and two plainclothes agents took their place.  UC-1 drove to the Winchell's and parked. While there, an individual on a phone rode a bike past two surveillance vehicles. Immediately after, UC-1 received a voice message from T-3 indicating police were following UC-1. After receiving the message, agents served a federal search warrant at H-1. RIVERA and others were detained during the warrant service, but CRUZ was not there. (Based on a later review of pole camera footage, agents believe CRUZ hid in a neighboring garage as agents approached to serve the warrant.) Among other things, agents seized approximately $28,000 in U.S. currency, a .40 caliber Glock handgun, and approximately 30 electronic devices. RIVERA was not arrested.

20.     On December 27, 2022, agents arrested L-3 for transporting undocumented individuals. During L-3's post arrest interview, L-3 admitted successfully smuggling undocumented individuals from Jacumba, California to Los Angeles, California on at least five prior occasions. L-3 stated that on each successful trip, he/she was directed to various locations in East Los Angeles to drop off the individuals. Upon his/her arrival at the location, an individual paid him/her and escorted the undocumented individuals out of his

7

vehicle. L-3 identified RIVERA as the person who paid him/her after the successful smuggling events. During a consent search of L-3's phone, agents found the number (323) 271-8391 in WhatsApp. When agents clicked on the number, a picture of RIVERA appeared. (WhatsApp allows users to select a profile picture that corresponds to their phone number). L-3 identified (323) 271-8391 as the phone number for RIVERA. According to T-Mobile, (323) 271-8391 was activated on November 7, 2022, and is subscribed to CRUZ at H-1.

21.   On February 17, 2023, L-4 was arrested for transporting undocumented individuals. During a post-arrest interview, L-4 consented to a search of his/her cell phone. While reviewing L-4's phone, agents discovered messages from the number (323) 592-1031 asking L-4 to share S-2's live location and indicating that the number was the brother of the person that was coordinating the smuggling event. According to T-Mobile, (323) 592-1031 was activated on September 9, 2022, and is subscribed to CRUZ's wife at H-1.

22.   On March 15, 2023, CRUZ and RIVERA were indicted under seal in the Southern District of California, and arrest warrants were issued.

23.   On April 9, 2023, agents arrested CRUZ at the San Ysidro, California Port of Entry. CRUZ was in possession of **Target Device 1**.

24.   On April 10, 2023, agents arrested RIVERA outside of the garage associated with H-1. RIVERA was in possession of **Target Device 2** which was seized and booked in evidence at San Diego Sector, above.

25.   Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that CRUZ and RIVERA were using the **Target Devices** to communicate with co-conspirators to further their alien smuggling conspiracy. Accordingly, I request permission to search the **Target Devices** for

1   data from Sept. 8, 2022 (the date of the search of H-1), up to and including April 10, 2023

2   (the day RIVERA was arrested).

### METHODOLOGY

4        26.    It is not possible to determine, merely by knowing a cellular telephone's make,

5   model and serial number, the nature and types of services to which the device is subscribed,

6   and the nature of the data stored on the device. Cellular devices today can be simple cellular

7   telephones and text message devices, can include cameras, can serve as personal digital

8   assistants and have functions such as calendars and full address books and can be mini-

9   computers allowing for electronic mail services, web services and rudimentary word

10  processing. An increasing number of cellular service providers now allow for their

11  subscribers to access their device over the internet and remotely destroy all of the data

12  contained on the device. For that reason, the device may only be powered in a secure

13  environment or, if possible, started in "flight mode" which disables access to the network.

14  Unlike typical computers, many cellular telephones do not have hard drives or hard drive

15  equivalents and store information in volatile memory within the device or in memory cards

16  inserted into the device.  Current technology provides some solutions for acquiring some

17  of the data stored in some cellular telephone models using forensic hardware and software.

18  Even if some of the stored information on the devices may be acquired forensically, not all

19  of the data subject to seizure may be so acquired. For devices that are not subject to forensic

20  data acquisition or that have potentially relevant data stored that is not subject to such

21  acquisition, the examiner must inspect the device manually and record the process and the

22  results using digital photography. This process is time and labor intensive and may take

23  weeks or longer.

24       27.    Following the issuance of this warrant, a case agent familiar with the

25  investigation will collect the subject cellular telephone and subject it to analysis. All

26  forensic analysis of the data contained within the telephone and its memory cards will

27  employ search protocols directed exclusively to the identification and extraction of data

28  within the scope of this warrant.

9

28.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

29.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

30.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of the offenses above.

31.     Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachment B using the above-described methodology.


I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Alexander C. Susral, Jr.
Border Patrol Agent


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of May 2023.


_____
Honorable Bernard G. Skomal
United States Magistrate Judge

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Cellphone
FP&F No. 2023565600003201 Item 0001
(**"Target Device 1"**)

**Target Device 1** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector located at 311 Athey Avenue, San Ysidro, California 92173.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **Sept. 8, 2022, up to and including April 10, 2023**:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States and facilitate the transportation of smuggled aliens within the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and the transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

all of which are evidence of violations of Title 8, United States Code, Section 1324 (bringing in and transporting undocumented aliens and conspiracy to do same).